## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| Eric Williams, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 4:11-CV-093 |
| | § | |
| City of Arlington, et al. | § | |
| | § | |
| Defendants. | § | |

### PLAINTIFF ERIC WILLIAMS' SECOND AMENDED COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW Plaintiff, Eric Williams, by and through the undersigned counsel, and files this, his Second Amended Complaint against Defendants, the City of Arlington, code compliance officer David Engel and other unnamed police and code compliance officers of the City of Arlington, National Football League, Jerral "Jerry" Wayne Jones, JWJ Corporation, Cowboys Stadium, L.P., Cowboys Stadium GP, LLC, Blue & Silver, Inc., and North Texas Super Bowl XLV Host Committee, Inc.

**I.    JURISDICTION**

1.1    This action is brought pursuant to 42 U.S.C.A. § 1983 and 42 U.S.C.A. § 1988. Jurisdiction is founded upon 28 U.S.C.A. § 1331 and 28 U.S.C.A. § 1343. Pendent and supplemental jurisdiction is invoked for this Court to decide claims that may arise under state law.

## II.    VENUE

2.1    Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this cause of action occurred in this District.

## III.    PARTIES

3.1    Plaintiff Eric Williams ("Mr. Williams") is an individual residing in Irving, Dallas County, Texas. Mr. Williams owns and operates Out The Box Productions, a Texas proprietorship. Mr. Williams has a Texas driver's license number 24527032, and the last four digits of his social security number are 2632.

3.2    Defendant City of Arlington is a municipal corporation formed and existing within the State of Texas, located in Tarrant County, and at all times relevant to this complaint, Defendant City of Arlington employed defendant police and code compliance officers referred to *infra*. This Defendant has made an appearance in this suit.

3.3    Defendants unnamed police officers and code compliance officers, including officer David Engel, are now, and at all times relevant to this complaint were, police and code compliance officers of the City of Arlington in the State of Texas. Relief is sought from these unknown defendants in their official and individual capacities. The City of Arlington has agreed to produce the identities of these as yet unnamed officers in its Fed. R. Civ. P. 26(a)(1)(A)(i) disclosures on July 28, 2011 and Plaintiff will name and add these parties and attempt service on them after that date.

3.4    Defendant National Football League ("NFL") is an unincorporated association of NFL teams which, based on information and belief, is licensed to conduct business in the State of Texas. This Defendant has made an appearance in this suit.

3.5    Defendant Jerral "Jerry" Wayne Jones ("Jones") is an individual who resides in Dallas County, Texas[1], and is the owner and general manager of the NFL team, the Dallas Cowboys. This Defendant has made an appearance in this suit.

3.6    JWJ Corporation ("JWJ") is a Texas corporation which is registered to conduct business in the State of Texas and has its principal place of business at One Cowboys Parkway, Irving, Texas 75063 in Dallas County, Texas. This Defendant has made an appearance in this suit.

3.7    Defendant Cowboys Stadium, L.P. is a Texas Domestic Limited Partnership which is registered to conduct business in the State of Texas and has its principal place of business at One Cowboys Parkway, Irving, Texas 75063 in Dallas County, Texas. This Defendant has made an appearance in this suit.

3.8    Defendant Cowboys Stadium GP, LLC is the general partner of Defendant Cowboys Stadium, L.P. and a Texas Domestic Limited Liability Company which is registered to conduct business in the State of Texas and has its principal place of business at One Cowboys Parkway, Irving, Texas 75063 in Dallas County, Texas. This Defendant has made an appearance in this suit.

---

[1] Plaintiff has redacted Jones' home address to protect Jones' personal privacy.

3.9     Defendant Blue & Silver, Inc. ("Blue & Silver") is the managing member of Cowboys Stadium, L.P. and a Texas corporation which is registered to conduct business in the State of Texas and has its principal place of business at One Cowboys Parkway, Irving, Texas 75063 in Dallas County, Texas. This Defendant has made an appearance in this suit.

3.10    Defendant North Texas Super Bowl XLV Host Committee, Inc. ("Host Committee") first acted as the North Texas Super Bowl XLV Bidding Committee, Inc. ("Bidding Committee") to secure the bid to host the Super Bowl at Cowboys Stadium and later assisted with the organization, administration, management, promotion, and operation relating to hosting the Super Bowl. This Defendant has answered this suit.

## IV.    FACTUAL BACKGROUND

4.1     In 2006 the Dallas Cowboys, under the leadership of Jones, began construction of Cowboys Stadium in Arlington Texas, anticipating that the new stadium would be a competitive candidate to host a future Super Bowl game. Based on information and belief, the stadium was designed with the goal of hosting a Super Bowl in mind, a goal Jones sought to achieve as early as the 1990s.

4.2     The anticipated tax revenue associated with Cowboys Stadium and the high profile events it would host, including the Super Bowl, incentivized the City of Arlington to approve a tax increase by which the City of Arlington contributed about $325 million toward the $1.2 billion construction cost for Cowboys Stadium. The City of Arlington hoped to recover this investment, in part, through tax revenue generated by hosting the

Super Bowl and other high profile events. Arlington Mayor Robert Cluck, who was instrumental in bringing the Dallas Cowboys from Irving to Arlington, felt that hosting the Super Bowl was one of the top priorities to make the stadium investment profitable.

4.3    In the summer of 2006, Jones, acting at all times relevant to this litigation on behalf of himself, an agent of JWJ and the Cowboys Defendants, and, at times, as an agent of the NFL, also began a campaign of negotiations to make the City of Arlington, together with other North Texas cities, the host of the 2011 Super Bowl game. Jones enlisted George Bayoud ("Bayoud") in the summer of 2006, to serve as the president of the Bidding Committee. Jones and Bayoud then asked Roger Staubach ("Staubach") to serve as the Biding Committee's chairman, a position Staubach accepted.

4.4    In the fall of 2006, the NFL published its official "Request for Proposals" ("RFP") for Super Bowl XLV bids, a roughly 244 page document which contains a list of NFL requirements for a prospective host city.

4.5    In preparation for the final bid, Jones, Staubach, and the rest of the Bidding Committee, which included in its membership City of Arlington Mayor Robert Cluck, reviewed voluminous documents detailing the NFL's requirements. Charlotte Anderson, Executive Vice-President of the Dallas Cowboy Football Club, was also a member of the Bidding/Host Committee. Members of the Bidding Committee then met with the city council members of the City of Arlington and the other North Texas cities which would host various Super Bowl related events, and other city and business leaders, soliciting agreements to comply with the NFL's requirements so that the Bidding Committee could

mount a victorious bid and Cowboys Stadium could host the Super Bowl as Jones had intended.

4.6    Although the Super Bowl would be played in Arlington, Arlington could not host the event alone due to the large number of expected tourists, requiring accommodation for thousands of people, in addition to requiring venues for other Super Bowl related events throughout the region. Therefore, the bid called for North Texas to host the Super Bowl, with various events held throughout the Dallas-Fort Worth metroplex. The Bidding Committee solicited six cities to participate in the regional effort: Arlington, Dallas, Fort Worth, Grand Prairie, Grapevine, and Irving.

4.7    Among the governmental assurances requested in the NFL's RFP and the Bidding Committee's discussions with and presentations to city leaders, was a requirement regarding ambush marketing.

4.8    Ambush marketing can be defined as misleading advertising that attempts to create an association between the advertiser and a major sporting event and thereby deprives official sponsors of commercial value received from their sponsorship.

4.9    Applying their own overly broad interpretation of ambush marketing, the NFL required the host cities to provide a "clean zone" of about a one mile radius around Cowboys Stadium and area airports and a six block radius around the NFL headquarters hotel and NFL Experience sites. In the event the City of Arlington proved unable to enact the anti-ambush marketing provisions, the RFP stipulated that the Host Committee would be required to pay the NFL $1 million which the NFL would use to privately

protect its sponsors from ambush marketing. In consideration for its compliance with those requirements, the NFL estimated that hosting a Super Bowl would generate about $400 million in economic impact for the region and would result in beneficial national and international media exposure for the cities involved.

4.10   The NFL represented to the City of Arlington that it would obtain a federal court order authorizing the NFL to enforce its own ambush marketing restrictions. Based on information and belief, the NFL never secured such an order.

4.11   The City of Arlington passed a resolution "regarding assurances to the NFL" in preparation for the final bid proposal. In this resolution, among other things, the Arlington City Council "directs all City agencies, departments and personnel to . . . cooperate with the Host Committee." After securing agreements to meet the NFL's requirements, the executive summary of the Bidding Committee's efforts was submitted to each of the 32 NFL team owners in April 2007, prior to the NFL's bid deadline. The two competing cities were Glendale, Arizona, and Indianapolis, Indiana.

4.12   On or about May 22, 2007, key members of the Bidding Committee attended the Spring NFL Owners Meeting in Nashville, TN, where Jones and Staubach addressed the remaining NFL team owners, making their final pitch for their bid proposal, promising to deliver the best and grandest Super Bowl possible. Later that day the announcement was made that the 32 NFL team owners had voted to accept the bid proposal submitted by the Bidding Committee on behalf of the City of Arlington. Pursuant to the contractual agreement, the City of Arlington would host  Super Bowl XLV at Cowboys Stadium.

4.13   The NFL's requirements continued to be discussed and addressed after North Texas was selected to host Super Bowl XLV. For instance, on November 16, 2010, Trey Yelverton ("Yelverton"), a Deputy City Manager for the City of Arlington, addressed the Arlington City Council for a "Super Bowl Update." Among the topics discussed that day were the ambush marketing requirements. He explained that the "clean zone" would consist of an area of about a one mile radius surrounding the stadium, although designated areas including parking lots to be used by the stadium and areas used for event support would be exempt to allow Super Bowl sponsors to market there.

4.14   Although city leaders repeatedly asserted that the ordinance was intended to affect peddlers and itinerant vendors, specifically people selling unofficial NFL merchandise, the plain language of the ordinance is far broader in scope. It expands the definition of "outdoor festivals" to include any temporary structure "including but not limited to temporary retail locations, tents, canopies, and air-supported, air-inflated and tensioned membrane structures" which is "visible from any public street." It also prohibits the "[o]utdoor sale or distribution of merchandise . . . to the public visible from any public street," except for "[m]erchandise sold or distributed in the ordinary course of business at a location for which a Certificate of Occupancy has been issued." Yelverton clarified that some limited "outdoor festivals" would be permitted, but the City of Arlington would require a festival permit and the activity would have to be consistent with the entity's normal business operations. Additionally, the City of Arlington would not allow

"branded" activities because its goal was to ensure the investments of the NFL and its sponsors "are protected" so as to fulfill its "obligations" to the NFL.

4.15    Although pretextual justifications for the ordinance are also provided, including public safety arguments and aesthetic quality, the contractual requirements for the protection of NFL sponsors are the overwhelming impetus behind the passage of the ambush marketing ordinance.

4.16    According to Yelverton, to enforce anti-ambush marketing efforts, the NFL intended to acquire a federal court order prior to the date of the Super Bowl to ensure that they could stop anybody from selling merchandise that had not been properly licensed by the NFL. For previous Super Bowls, the NFL has hired security officers to canvas the area surrounding the Super Bowl looking for ambush marketing. Based on information and belief, the NFL hired such private security officers to police ambush marketing for Super Bowl XLV. Additionally, the City of Arlington earmarked funding to conduct "neighborhood drive alongs" in both commercial areas and residential neighborhoods to ensure compliance with the "clean zone" and planned to ask citizens to report violations.

4.17    The implications of the ambush marketing ordinance appear to have been poorly understood by even the lawmakers involved in passing the ordinance, and explanations offered to the public and enforcing officers concerning the ordinance were sparse, unclear, and inconsistent. For instance, Yelverton explained that the ordinance is meant to deal with "peddlers and itinerant vendors." He also explained that outdoor advertising

displays would be acceptable if they were advancing the business owner's brand in a way consistent with the business. He further explained: "It's a fine line we're trying to ride . . . taking advantage of the entrepreneurial spirit of what's going on but to also reflect the principles and the ***obligations*** that we've got to the NFL and the host committee." (Emphasis added).

4.18   On or about January 12, 2011 the Arlington City Council voted to pass the ambush marketing ordinance. The ordinance would be effective for a period of about two weeks beginning in January 2011 and ending on February 7, 2011. Yelverton stated that "Arlington Police and code compliance inspectors will be looking around the area watching out for people trying to sell merchandise unrelated to their businesses . . . [and] are also going to look for public intoxication." Councilman Gene Patrick also seemed confused by the ordinance, indicating that it applied to peddlers and was intended to "clean up the image of this worldwide event."

4.19   The media appeared equally confused by the ordinance. The Dallas Business Journal, for instance, reported that "[o]utdoor advertising immediately surrounding Cowboys Stadium for the two weeks leading up to the Super Bowl will be stringently policed for Super Bowl sponsor competitors. Lawful ads will be allowed, those ads or handbills unlawfully infringing upon NFL trademarked terms will be confiscated, and hefty fines could be issued to advertisers."

4.20   The City of Arlington did little to ensure that residents and property owners were aware of the existence and implications of the ambush marketing ordinance.

Furthermore, the City of Arlington failed to adequately train its officers to enforce the ordinance which was passed approximately two weeks before it went into effect, and remained in effect for only about two weeks. There is simply no plausible way the City could have instituted and completed an adequate training program in relation to the complexity of the task expected to be performed by the officers in the time available, accordingly, it is conceivable and plausible the City exhibited deliberate indifference to the rights of its inhabitants.

4.21    Based on information and belief, the Host Committee, while pervasively entwined with both the City of Arlington and the NFL-Cowboys Defendants, played an integral role in coordinating the implementation and enforcement of the ambush marketing ordinance. For instance, although the ordinance does not, on its face, exempt NFL sponsors, at the direction of the NFL-Cowboys Defendants and the Host Committee, NFL sponsors were permitted to host branded "outdoor festivals," engage in the "outdoor sale and distribution of merchandise," and place outdoor advertising displays within the "clean zone."

4.22    Mr. Williams has created successful after-school programs in an effort to motivate and inspire at risk youth. In his after-school programs, Mr. Williams teaches students how to produce short films and music videos featuring positive and encouraging messages. He has also provided opportunities for interested students to assist in the production of documentaries. In addition to his after-school programs, Mr. Williams, with the aid of corporate sponsors, shares messages regarding important social topics

with students in various school districts and community colleges, including a safe-driving campaign and an anti-bullying campaign.

4.23    Motivated by the success of his program, Mr. Williams decided to take his anti-bullying campaign to the general public in the week leading up to the Super Bowl. Mr. Williams organized this anti-bullying campaign with the co-sponsorship of Best Buy. Although negotiations for this campaign took place mainly with Best Buy's regional headquarters, the campaign would be hosted at the Arlington Best Buy on the property of Lincoln Square. Mr. Williams also sought and obtained permission from Lincoln Square's property manager to use that venue.

4.24    In his work with local school districts, Mr. Williams uses a mobile production studio onboard a bus. The exterior of the bus features photographs of local African-American radio personalities and of Mr. Williams himself and it has not changed in several years. He has obtained permission to use each photograph and none of the individuals depicted is associated with the NFL. No references are made to football, the NFL, or the Super Bowl on Mr. Williams' bus or any other sign used for his anti-bullying campaign.

4.25    Mr. Williams' bus had been parked in the Best Buy parking lot on the Friday and Saturday immediately before the Super Bowl and throughout the prior week without any problems. The only signage outside of the bus read "Anti-Bullying Campaign" and contained the logos of Mr. Williams' company, Best Buy, and Geek Squad, as co-sponsors of the campaign. As part of the anti-bullying campaign, Mr. Williams intended

to host a video game tournament with prizes for the winners. This tournament was designed to raise awareness for the anti-bullying campaign and raise funds for Mr. Williams' after school programs in the face of state budget cuts that threaten the continued existence of such programs.

4.26    On Saturday, February 5, 2011, and Sunday, February 6, 2011, the parking lot surrounding Mr. Williams' bus hosted a country music concert, with large banners displaying the Coors Light logo and at least one mobile billboard advertising Plains Capital Bank. Plains Capital Bank and Coors Light were official Super Bowl sponsors and were therefore permitted to host a branded outdoor festival and rely on outdoor advertising displays despite previous statements as well as the apparent prohibition in the ordinance that such outdoor festivals and advertising displays would not be permitted in the clean zone.

4.27    At about 10:30 a.m. on Sunday, February 6, 2011, Mr. Williams was on his bus with his assistants, several children, and some parents, when an Arlington code compliance officer came on the bus. Believing the officer to be a parent, Mr. Williams invited him to join them. The officer informed him that he was not there to socialize and instructed Mr. Williams to step off of the bus and provide identification. Mr. Williams complied and the officer gestured toward the photographs of local African American men on the exterior of the bus and asked: "What's all this shit?" When Mr. Williams questioned what the officer meant by that, the officer rephrased his question and asked: "What's all this stuff?" Confused, Mr. Williams asked the officer what the problem was,

and the officer instructed him that he must move the bus immediately. Mr. Williams again sought clarification and was simply told to move the bus immediately. At no time did the officer inform him of the ambush marketing ordinance or the "clean zone," but simply stated that Mr. Williams needed a permit to be there. Mr. Williams informed him that he had permission and Mr. Williams immediately contacted the property manager of Lincoln Square and a representative of Best Buy. The property manager, assistant property manager, and Best Buy representative all came to the bus and informed the officer that Mr. Williams had permission to be there. The officer, however, informed them that he did not care and would give Mr. Williams an hour and a half to leave, threatening to issue a ticket if Mr. Williams was still there when the officer returned.

4.28    The property manager suggested that Mr. Williams should just take the ticket and try to resolve what they all believed to be a misunderstanding at a later time. When the officer returned about an hour and a half later, he stood outside and asked Mr. Williams to exit the bus again. When Mr. Williams complied, the officer instructed him to sign the ticket he had written. The assistant property manager and a Best Buy representative both returned and told the officer again that Mr. Williams had permission to be there.

4.29    Believing the officer would force Mr. Williams to leave, Best Buy was prepared to collect the electronic equipment it had provided for the anti-bullying campaign, but Mr. Williams assured them that he would take the ticket and remain at the location. Mr. Williams signed the ticket issued by Officer Engel ("Engel") and the officer told him he had another 30 minutes to leave before the officer returned.

4.30    About 30 minutes later the code compliance officers returned again. This time, Engel asked Mr. Williams what he was selling or promoting. Mr. Williams informed him that he was not selling anything but was there for an anti-bullying campaign, which Best Buy and the property managers had also told the officer during their previous encounters. Engel informed Mr. Williams the NFL had instructed the officers to get Mr. Williams' bus out of the area. The property managers came once again to attempt to discuss the situation with the officers. Engel walked back to his vehicle and made a telephone call. By this time, a crowd had begun to gather around the bus and several people asked what was going on and why the officers were bothering Mr. Williams.

4.31    About 10 to 15 minutes later, two police vehicles approached with lights and sirens blaring. The lights and sirens remained on while the police officers confronted Mr. Williams. This drew enormous attention from the crowd, causing Mr. Williams great embarrassment and injury to his reputation. The police officers approached with their hands on their guns, where their hands remained throughout their conversation, and instructed Mr. Williams to remove his hands from his pockets.

4.32    Both police officers and Engel are white. Engel approached the property manager following the third confrontation and instructed her to leave this issue alone, stating that the officers had "this shit" handled. He further told her that the images on the bus were offensive and that was his reason for asking Mr. Williams to leave. After speaking with the property manager, the police officers returned and instructed Mr. Williams that he would be arrested and his bus would be towed at his expense if he did not leave

immediately. Because his bus driver was not currently present they agreed to give him 20 to 30 minutes to move the bus.

4.33   Mr. Williams left to get the bus driver while his assistants packed everything up. While Mr. Williams was gone several people asked his assistants what was going on because the police sirens had drawn their attention. Best Buy collected its electronic equipment and Mr. Williams vacated the property.

4.34   Best Buy was not cited for violating the ambush marketing ordinance, nor did the officers threaten it with any adverse action regarding its signage on the banner displayed alongside Mr. Williams' bus.  In fact, of the fourteen citations issued on February 6, 2011 none were issued to business entities. Eight were issued to individuals identified as African-American, one was issued to an individual identified as Hispanic, three were issued to individuals with apparently Hispanic names with no race indicated, and two additional individuals were cited but no race is indicated for those individuals. Based on information and belief, the ordinance was enforced with racially discriminatory intent.

4.35   Mr. Williams has entered a plea of not guilty in the criminal case. A court date has been set in September, 2011.

## V.   CLAIMS FOR RELIEF COMMON TO ALL DEFENDANTS

## A. FIRST CLAIM FOR RELIEF: VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983

5.1   Plaintiff incorporates all of the allegations contained in the previous paragraphs of this complaint as though fully set forth herein.

5.2    Defendants violated Mr. Williams' First Amendment rights, incorporated into the Due Process Clause of the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.

5.3    Arlington's ambush marketing ordinance deprived Mr. Williams of his rights to free speech and association.

5.4    Mr. Williams was engaging in both political and commercial speech when the code compliance and police officers harassed, intimidated, and threatened him and charged him with a crime for engaging in protected speech.

5.5    At all times material to this case, the code compliance officers and police officers were acting under color of state law as employees of the City of Arlington.

5.6    The deprivations of Mr. Williams' First Amendment rights can be attributed to the enforcement of the ambush marketing ordinance which was passed by the City of Arlington on or about January 12, 2011, pursuant to contractual obligations it owed the NFL.

5.7    At all times relevant to the claims set forth in this complaint, the City of Arlington was pervasively entwined with, acted jointly with, and /or engaged in concerted action with the private party defendants. The City of Arlington and the private party defendants shared the common goals of protecting the NFL's trademarks and trade dress and enhancing the economic investment of Super Bowl sponsors. The passage and enforcement of the ambush marketing ordinance, pursuant to the pervasive entwinement, joint and/or concerted action, violated Mr. Williams' constitutional rights.

Therefore, the private party defendants were engaged in state action alongside the City of Arlington and the police and code compliance officers of the City of Arlington.

5.8     Defendants' actions, jointly and severally, caused Mr. Williams compensatory damages in the form of lost profits, lost business opportunities, future lost wages, humiliation, mental anguish, and damage to his reputation, in an amount to be determined by the jury.

5.9     The private party defendants acted with callous or reckless indifference to Mr. Williams' constitutional rights, motivated by financial gains, and are therefore liable for punitive damages in an amount to be determined by the jury.

**B. SECOND CLAIM FOR RELIEF: THE ORDINANCE AND ENFORCEMENT THEREOF VIOLATED PLAINTIFF'S DUE PROCESS RIGHTS UNDER 42 U.S.C. § 1983**

6.1     Plaintiff incorporates all of the allegations contained in the previous paragraphs of this complaint as though fully set forth herein.

6.2     Defendants, through their pervasively entwined, joint and/or concerted action, violated Mr. Williams' Fourteenth Amendment Due Process rights, actionable under 42 U.S.C. § 1983.

6.3     The ordinance deprived Mr. Williams of property and liberty interests without due process of law.

6.4     The code compliance officers' and police officers' exercise of police power to enforce the ordinance selectively against Mr. Williams constitutes an abuse of the state's police power.

6.5     Furthermore, the officers charged Mr. Williams with the crime of "ambush marketing" without providing adequate notice of the offense. The ordinance is overly broad, vague, and burdensome, it fails to define the term "ambush marketing", and the City of Arlington failed to provide fair notice of the ordinance to property owners, residents, and the other people whose rights would be affected by the ordinance.

## C. THIRD CLAIM FOR RELIEF: VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION UNDER 42 U.S.C. § 1983

7.1     Plaintiff incorporates all of the allegations contained in the previous paragraphs of the complaint as though fully set forth herein.

7.2     The ordinance irrationally and impermissibly discriminates against individuals and entities that were unable to contract with the NFL for sponsorship rights while exempting from regulation NFL sponsors.

7.3     The ordinance irrationally and impermissibly discriminates among similarly-situated classes of citizens based on financial resources and NFL connections.

7.4     The code compliance and police officers irrationally and impermissibly discriminated against Mr. Williams in their selective enforcement of the ordinance, following NFL requests, based on his race and based on his inability to become a Super Bowl sponsor.

7.5     Defendants' pervasively entwined, joint and/or concerted action violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

**D. FOURTH CLAIM FOR RELIEF: VIOLATION OF THE CONTRACTS CLAUSE OF THE U.S. CONSTITUTION**

8.1     Plaintiff incorporates all of the allegations contained in the previous paragraphs of this complaint as though fully set forth herein.

8.2     The ordinance and enforcement thereof substantially impaired the contractual relationship between Mr. Williams and the property owners with whom he contracted to host the anti-bullying campaign in the Best Buy parking lot in violation of the Contracts Clause, Article 1, Section 10, Clause 1 of the U.S. Constitution.

8.3     Defendants jointly violated the Contracts Clause of the U.S. Constitution through their pervasively entwined, joint and/or concerted action.

**E. FIFTH CLAIM FOR RELIEF: VIOLATION OF 42 U.S.C. § 1981**

9.1     Plaintiff incorporates all of the allegations contained in the previous paragraphs of this complaint as though fully set forth herein.

9.2     The code compliance and police officers selectively enforced the ordinance against Mr. Williams, following NFL requests, because he is an African American man and his bus features pictures of other African American men, denying to him the right to make and enforce contracts on the same basis as white persons in violation of 42 U.S.C. 1981.

9.3     Defendants harmed Mr. Williams by pervasively entwined, joint and/or concerted action.

**F. SIXTH CLAIM FOR RELIEF: STIGMA-PLUS DEFAMATION CLAIMS**

10.1    Plaintiff incorporates all of the allegations contained in the previous paragraphs of this complaint as though fully set forth herein.

10.2   Mr. Williams was cited for "ambush marketing," a term few people understand, after the code compliance and police officers created a public spectacle in a crowded public forum. This charge is calculated to appear when school districts perform background checks on Mr. Williams before allowing him to work with their children, which will foreseeably create a negative stigma and result in school districts to refuse to renew or engage in new contracts for Mr. Williams' services.

10.3   Additionally, the anti-bullying campaign marked the first occasion of co-sponsorship between Mr. Williams and Best Buy. Mr. Williams worked diligently to secure the agreement of both Best Buy and Lincoln Square. The difficulties experienced on February 6, 2011, and the officers' threats to arrest Mr. Williams and accusations that his bus was offensive are calculated to damage his reputation with those businesses.

10.4   The defamation occurred in conjunction with the deprivation of tangible interests set forth in the preceding paragraphs of Plaintiff's complaint. This has harmed and will continue to harm Mr. Williams' reputation in the future.

10.5   As a result, Mr. Williams has been damaged in the form of mental anguish and emotional distress in addition to economic damages resulting from lost business opportunities and damage to his reputation.

10.6   As of the filing of this complaint, Plaintiff has not been afforded a name-clearing hearing. Even if a name-clearing hearing were available, the public spectacle created by the code compliance and police officers while harassing and citing Mr. Williams for the "crime" of ambush marketing renders a name-clearing hearing inadequate.

10.7    Defendants defamed Mr. Williams by pervasively entwined, joint and/or concerted action.

## VI. CLAIMS FOR RELIEF AGAINST THE PRIVATE PARTY DEFENDANTS:
## A. FIRST CLAIM FOR RELIEF: COMMON LAW DEFAMATION

11.1    Plaintiff incorporates all of the allegations contained in the previous paragraphs of this complaint as though fully set forth herein.

11.2    Mr. Williams was cited for "ambush marketing," a term few people understand, after the code compliance and police officers created a public spectacle in a crowded public forum. This charge is calculated to appear when school districts perform background checks on Mr. Williams before allowing him to work with their children, which will foreseeably create a negative stigma and result in school districts to refuse to renew or engage in new contracts for Mr. Williams' services.

11.3    Additionally, the anti-bullying campaign marked the first occasion of co-sponsorship between Mr. Williams and Best Buy. Mr. Williams worked diligently to secure the agreement of both Best Buy and Lincoln Square. The difficulties experienced on February 6, 2011, and the officers' threats to arrest Mr. Williams and accusations that his bus was offensive are calculated to damage his reputation with those businesses.

11.4    The defamation occurred in conjunction with the deprivation of tangible interests set forth in the preceding paragraphs of Plaintiff's complaint. This has harmed and will continue to harm Mr. Williams' reputation in the future.

11.5    As a result, Mr. Williams has been damaged in the form of mental anguish and emotional distress in addition to economic damages resulting from lost business opportunities and damage to his reputation.

11.6    As of the filing of this complaint, Plaintiff has not been afforded a name-clearing hearing. Even if a name-clearing hearing were available, the public spectacle created by the code compliance and police officers while harassing and citing Mr. Williams for the "crime" of ambush marketing renders a name-clearing hearing inadequate.

11.7    Defendants defamed Mr. Williams by pervasively entwined, joint and/or concerted action.

## B. SECOND CLAIM FOR RELIEF: TORTIOUS INTERFERENCE WITH CONTRACT AND/OR BUSINESS RELATIONS

12.1    Plaintiff incorporates all of the allegations contained in the previous paragraphs of this complaint as though fully set forth herein.

12.2    Mr. Williams had contracts with both Lincoln Square and Best Buy to host an anti-bullying campaign on their property on February 6, 2011.

12.3    Mr. Williams also anticipated future business relations with those entities.

12.4    Defendants willfully and intentionally interfered with those contracts and/or business relations.

12.5    Defendants harmed Mr. Williams through their pervasively entwined, joint and/or concerted action.

12.6   Defendants' interference, jointly and severally, proximately caused Mr. Williams damages in the form of lost earnings, lost business opportunities, damaged reputation, humiliation, and emotional distress in an amount to be determined by the jury.

## C. THIRD CLAIM FOR RELIEF: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

13.1   Defendants intentionally or recklessly implemented the ordinance, and instructed its enforcement against Mr. Williams, knowing that their actions would subject Mr. Williams to severe emotional distress due to public humiliation and damage to his business and reputation.

13.2   Defendants' conduct was extreme and outrageous.

13.3   Defendants' conduct proximately caused Mr. Williams damage in that it caused him to suffer severe emotional distress.

13.4   Mr. Williams' emotional distress has been severe in that he has suffered insomnia, stress, anxiety, depression, high blood pressure, nausea, chest pain, and fluctuations in weight and appetite. Mr. Williams, in all reasonable probability, will continue to suffer this mental pain and anguish in the future.

13.5   Defendants' conduct was grossly negligent so as to entitle Mr. Williams to recover exemplary damages.

## D. FOURTH CLAIM FOR RELIEF: NEGLIGENCE

14.1   Defendants owed Mr. Williams the common-law duty of ordinary care.

14.2   Defendants breached that duty.

14.3   Defendants' breach proximately caused Mr. Williams' damages.

## VII. ATTORNEY FEES

15.1    Plaintiff is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law.

## VIII. PRAYER FOR RELIEF

16.1    WHEREFORE, Plaintiff respectfully requests the following relief:

> a.   A declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring the ordinance invalid because it violates numerous provisions of the United States Constitution and various other state and federal laws as set forth herein;
>
> b.   A declaratory judgment, pursuant to 28 U.S.C. 2201 and 2202, declaring that Mr. Williams' bus is not a form of ambush marketing with respect to the NFL or NFL sponsors;
>
> c.   A declaratory judgment, pursuant to 28 U.S.C. 2201 and 2202, declaring that the citation issued to Mr. Williams is invalid and unconstitutional, and therefore prosecution thereof shall terminate in Mr. Williams' favor;
>
> d.   A permanent injunction, pursuant to Fed. R. Civ. P. 65, prohibiting Defendants from implementing or enforcing this or any substantially similar ordinance now and in the future;
>
> e.   An order awarding Plaintiff costs and attorney's fees, pursuant to 42 U.S.C. § 1988 and other applicable law;

f.  Compensatory, statutory, exemplary, and/or punitive damages against each and every Defendant, jointly and severally, as permitted by law, in an amount to be determined by the jury;

g.  All other damages to which Plaintiff may be justly entitled;

h.  Such other and further relief as the Court deems just and proper.

**[SIGNATURE PAGE FOLLOWS]**

Dated: July 22, 2011

Respectfully submitted,


By:  /s/ Corinna Chandler
Corinna Chandler
Texas Bar No. 24061272
CHANDLER MARTINEZ, L.L.P.
6611 Hillcrest Avenue, Box # 542
Dallas, Texas  75205
(214) 758-0354 Telephone
(214) 758-0362 Facsimile
chandler@chandlermartinez.com

By: /s/ Jonathan F. Winocour
JONATHAN F. WINOCOUR
State Bar No. 24037730
DAVID P. RAY III
State Bar No. 24027766

WINOCOUR | RAY
9400 N. Central Expressway, Suite 1204
Dallas, Texas 75231
(214) 575-6060 Telephone
(214) 575-6220 Facsimile
jwinocour@winocour-ray.com
dray@winocour-ray.com

ATTORNEYS FOR PLAINTIFF

**[CERTIFICATE OF SERVICE FOLLOWS]**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 22nd day of July, 2011 a true and correct copy of the foregoing instrument has been served upon all counsel of record via the Court's CM/ECF Filing System as follows:

Denise V. Wilkerson
Melinda Hoffman Barlow
City of Arlington Attorney's Office
P.O. Box 90231 MS 63-0300
Arlington, Texas 76004-3231
Fax: 817/459-6897
denise.wilkerson@arlingtontx.gov
Melinda.barlow@arlingtontx.gov

Mitchell M. Murphy
David Fowler Johnson
Winstead PC
777 Main Street
Suite 1100
Fort Worth, Texas 76102
Fax: 817/420-8201
mmurphy@winstead.com
dfjohnson@winstead.com

Paul A. Grinke
McCathern Mooty Hyde Grinke LLP
3710 Rawlins
Suite 1600
Dallas, Texas 75219
Fax: 214/741-4717
receptionist@mccathernlaw.com

W. Michael Baggett
Winstead PC
5400 Renaissance Tower
1201 W. Elm Street
Dallas, Texas 75270
Fax: 214/745-5390
mbaggett@winstead.com

A paper copy of this document will be mailed via overnight U.S. Mail to the Honorable U.S. District Court Judge Terry R. Means on the business day following the electronic filing of the foregoing instrument and any attachments thereto.

/s/ Corinna Chandler
Corinna Chandler
Texas Bar No. 24061272
CHANDLER MARTINEZ, L.L.P.
6611 Hillcrest Avenue, Box # 542
Dallas, Texas  75205
(214) 758-0354 Telephone
(214) 758-0362 Facsimile
chandler@chandlermartinez.com